Filed 4/1/21  P. v. Quinones CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>STEVEN GEORGE QUINONES,<br><br>    Defendant and Appellant. | H046717<br>(Santa Clara County<br>Super. Ct. No. C1506188) |

Defendant Steven George Quinones was convicted after a court trial of multiple sexual offenses involving five children and was sentenced to a term of 1,320 years in prison consecutive to 36 years.  On appeal, Quinones argues that his trial counsel rendered ineffective assistance by failing to argue that otherwise time-barred claims were not sufficiently corroborated with independent evidence as required by Penal Code section 803, subdivision (f),[1] the sentence imposed in his case constitutes cruel and unusual punishment in violation of the Eighth Amendment of the federal Constitution, the trial court erroneously imposed certain fines and fees without first determining his ability to pay, and the abstract of judgment must be corrected to reflect a sentence of 45 years to life for one of his criminal convictions.

We agree with Quinones that the judgment should be modified to correctly reflect that he received a sentence of 45 years to life for one of his criminal convictions.  We reject his other claims of error.  We modify the judgment and affirm.

---

[1] Unspecified statutory references are to the Penal Code.

# I. BACKGROUND

## A. *The Amended Information*

On November 14, 2017, the Santa Clara County District Attorney's Office filed an amended information charging Quinones with 16 counts of committing a lewd or lascivious act on a child under the age of 14 (§ 288, subd. (a); counts 1-12, 27, 29, 32, 35), 12 counts of committing a lewd or lascivious act on a child age 14 or 15 (§ 288, subd. (c)(1); counts 13-24), rape (former § 261, subd. (2); count 25), forcible object penetration (§ 289, subd. (a); count 26), three counts of continuous sexual abuse of child under the age of 14 (§ 288.5, subd. (a); counts 28, 30, 33); oral copulation with a child under the age of 14 (former § 288a, subd. (c); count 31), and sexual penetration of a child age 10 or younger (§ 288.7, subd. (b); count 34). As to count 35, the information alleged that during the commission of the offense, Quinones had substantial sexual conduct with the victim within the meaning of section 1203.066, subdivision (a)(8). The information alleged numerous multiple victim enhancements (§ 667.61, subds. (b) & (e)), two prior strike convictions (§§ 667.5, subd. (c), 1192.7, subd. (c)), a prior serious felony conviction enhancement (§ 667, subd. (a)) and a prior prison term enhancement (§ 667.5, subd. (b)).

The information also alleged that the statute of limitations for counts 25 through 33 were tolled under section 803, subdivision (f) because the offenses were charged within a year of the victims' initial police reports, the conduct alleged involved substantial sexual conduct as described in section 1203.066, subdivision (b), and independent evidence clearly and convincingly corroborated the victims' allegations.

## B. *The Court Trial*

### 1. *M.D. (Counts 1-24)*

When M.D. was 13 years old, she lived with her great-aunt, Quinones, and her great-aunt's son in a one-bedroom apartment. Quinones was her great-aunt's husband. Her great-aunt and Quinones shared the bedroom, and her great-aunt's son and M.D.

slept in the living room. M.D. did not like living with her great-aunt, and her great-aunt would sometimes discipline M.D. by hitting her.

Quinones started molesting M.D. when she was 13 years old. Quinones would call M.D. into his room and would start play fighting with her—punching or tackling her—and kissing her neck. Quinones would put his tongue in M.D.'s mouth, and he would push M.D. down onto the bed. After Quinones kissed M.D., he would hold up his pinkie finger and the two would "pinkie swear." Quinones told M.D. not to tell anyone about what happened between them. M.D. complied and did not tell her great-aunt or anyone else about Quinones's molestation. M.D. did not think that anyone would believe her, and she thought that she would get in trouble if she said anything. According to M.D., Quinones called her into his room three or four times a week, and the molestation continued for two years until M.D. was 15 years old and moved out of the house.

According to M.D., the incidents with Quinones did not happen every day, and they occurred at various times. Sometimes Quinones would pull M.D. into his room on weekends or after school. Sometimes her great-aunt's son would be out in the apartment's living room. M.D.'s great-aunt was never home when Quinones molested M.D. M.D. did not believe that her great-aunt or her son ever witnessed any of the incidents that took place between her and Quinones.

M.D. described the details of an incident that occurred when she was 13 or 14 years old. Quinones called her into his room, started to play fight with her, put her on his bed, and started kissing her neck. Quinones then started to put his hand inside M.D.'s shirt. M.D. thought that Quinones was trying to touch her breasts and have sex with her. Quinones stopped when M.D.'s great-aunt unlocked the door and made a sound.

In 2014, when M.D. was 16 years old, she had a panic attack and told a school counselor about what had happened between her and Quinones. That same year, M.D. spoke with a detective with the San Jose Police Department. M.D. told the detective that the kissing and wrestling had taken place " '[w]henever [Quinones] wanted.' " At the

time M.D. reported Quinones's actions to the police, she had never met Quinones's other victims. After M.D. spoke with police officers, she learned that Quinones had a prior conviction for a sexual offense.

### 2. P.D. (*Counts 25-28*)

Quinones was P.D.'s stepfather. P.D.'s mother married Quinones when P.D. was a young child. P.D.'s mother and Quinones had four biological children together: S. (born 1981), S.D. (born 1982), N. (born 1990), and A. (born 1992). P.D.'s mother had four children from a prior marriage: M. (born 1974 and died 2009), P.D. (born 1976), J.D. (born 1977), and D. (born 1980). P.D.'s mother and Quinones later separated.

When P.D. was in the first or second grade, she moved with her family to a house in San Jose (hereafter "house1"). P.D. remembered that Quinones asked her to orally copulate him around that time, and he continued to ask her to orally copulate him until she was around 13 years old. Quinones also performed oral sex on P.D., and he did so at various times until she was 13 years old

After living at house1 for two or three years, the family moved to house2 when P.D. was in the third or fourth grade. While living at house2, Quinones asked P.D. to come to his room and had sex with her. Around that same time, Quinones put his fingers inside P.D.'s vagina.

When P.D. was nine years old, the family moved to house3, where they lived for approximately four years until P.D. was 13 years old. Quinones continued to have sex with P.D. while they lived at house3, sometimes either weekly or multiple times a week. Quinones would place his fingers inside P.D.'s vagina almost every time they had sex. P.D. did not realize that what was happening was wrong until she was around 11 years old and started watching talk shows that discussed topics like molestation or rape.

P.D. recalled an incident that occurred when she was around 11 years old. P.D. and her siblings had put on swimsuits to go swimming at a neighbor's house. Quinones did not let P.D. go with her siblings, and he had her stay home to wash the dishes.

4

After everyone left, Quinones took P.D. into one of the bedrooms, pushed aside her swimsuit, and had sex with her.

After having sex with P.D., Quinones would often ask her, "Don't you like it?" P.D. would say yes so that Quinones would finish. Sometimes Quinones would give P.D. money to go into the bedroom with him.

P.D. recalled another incident that took place when she was around 13 years old, around the time that her brother N. was a newborn baby. P.D. remembered that Quinones asked her to go to his bedroom, but she told him no because N. was with her on her bed in her room. Quinones pushed N. toward the wall, and P.D. went with Quinones into his room. There, Quinones had sex with P.D. Afterwards, he instructed her go to the shower to clean herself off. After P.D. was done cleaning herself, Quinones had her lay down on the bed a second time, and he had sex with her again. P.D. recalled that this time, N. was crying.

In 1991, P.D.'s sister M. accused Quinones of molesting her. Quinones was still having sex with P.D. at around that time. After M. made her allegations, the children, including P.D., were placed in a shelter. Later, the children moved with their mother to a different house.

M. never personally told P.D. the details about what had happened between her and Quinones. Likewise, P.D. never told M. about what Quinones did to her. Following M.'s accusations, P.D. was questioned by police officers. P.D. did not tell officers that Quinones had molested her. M. died in 2009.

P.D. explained that she did what Quinones asked of her because she thought of him as her father. P.D. also worried about what would happen to her family if she told anyone about Quinones's actions. Quinones told P.D. that he could make P.D.'s mother "go away," which P.D. interpreted as a threat toward her mother. Quinones also told P.D. that she would be separated from her siblings if she said anything.

5

Quinones served time in prison for the criminal case involving M. After he was released, he lived with various family members. Sometime in 2001 or 2002, Quinones moved in with P.D. and lived with her for a few months. At the time, P.D. lived with her mother, her sister M., and P.D.'s own children. P.D. did not say anything to her mother about what Quinones had done to her when she was a child. According to P.D., she had blocked out the memories of Quinones's abuse. P.D. eventually asked Quinones to leave because M. felt uncomfortable with the living situation.

In 2010, P.D. told her future husband about what had happened between her and Quinones. In 2012, J.D., P.D.'s sister, told P.D. that she had experienced something similar to what M. had experienced with Quinones. Earlier, in the late 1990s, another sister, S.D., told P.D. that the same kinds of things that had happened between M. and Quinones had also happened to her. P.D., however, never saw Quinones act inappropriately with any of her sisters.

In 2015, P.D. reported her experiences with Quinones to the police. P.D. felt relieved after she spoke with officers, but she also felt guilty for not speaking out when M. first made her accusations. P.D. regretted not coming forward and telling M. about her own experiences. When P.D. spoke with officers in 2015, she knew that Quinones was in custody and was being accused of committing sexual offenses against a child.

### 3. *J.D.* (*Counts 29-31*)

Quinones was J.D.'s stepfather. J.D. was approximately nine years old the first time that Quinones did something to her that made her feel uncomfortable. J.D. and her family were living at house2 at that time.

J.D. moved with her family to house3 sometime when she was 12 or 13 years old. The last time that Quinones did something inappropriate to J.D. was when she was 13 or 14 years old. J.D. recalled that Quinones molested her less than 10 times, and the incidents took place when she was between 10 and 14 years old.

6

When the family lived at house3, Quinones would sometimes nudge J.D. and ask her to come with him to his bedroom. Occasionally, J.D. would pretend to be sleeping. Other times, J.D. would comply with Quinones's request. After going into Quinones's bedroom, Quinones would lock the door and have J.D. sit on the bed. Quinones would then take off J.D.'s clothes from the waist down, touch her vaginal area, and perform oral sex on her. Quinones would touch J.D.'s vaginal area with his hand, but he would never penetrate her. After Quinones was finished, he would tell J.D. to put her clothes back on. J.D. did not tell anyone about what happened with Quinones. Quinones would tell J.D. that what happened between them was supposed to be private, and sometimes Quinones would leave J.D. money.

J.D. remembered that when she was a child, she would often try to stay outside and play for as long as possible in order to avoid Quinones. She did not remember telling Quinones "no." J.D. started to realize that what Quinones was doing was wrong when she was a teenager.

J.D. was 14 years old when M. accused Quinones of molesting her. J.D. remembered that her mother took M. to the hospital and had her examined. J.D. accompanied them and waited in the hospital waiting room. Nobody told J.D. why they were at the hospital. Afterwards, J.D. remembered that she and her sisters were taken away and placed into a group home. Eventually, J.D. moved in with her aunt.

After M. made her accusations, J.D. remembered that police officers spoke with her and asked her if she had similar experiences with Quinones. J.D. told the officers that nothing had happened. J.D. explained that she did not disclose Quinones's actions to the police at the time because she "didn't want to be . . . dirty," but she later regretted not "backing [her] sister."

When J.D. was in her 30s, she told her husband about what had happened with Quinones. About six years before Quinones's trial, J.D. confronted her mother. She also

7

told her sisters, P.D. and A. P.D. told J.D. that "things happened with her," but she did not provide any specific details.

Two years before Quinones's trial, J.D. was contacted by an investigator from the district attorney's office. At that time, J.D. disclosed Quinones's abuse. When she spoke with officers, J.D. explained that she regretted not defending M. when she made her accusations against Quinones.

### 4. *S.D.* (*Counts 32-33*)

Quinones was S.D.'s biological father. S.D. remembered that Quinones touched her inappropriately for the first time when she and her family lived at house3. She believed that the first incident took place when she was seven or eight years old, around the time when her brother N. was born.

S.D. recalled an incident that took place in house3's master bedroom. S.D. remembered that she was taking a nap at around noon, and she was fully clothed when she fell asleep. When she woke up, her pants and underwear had been removed, and Quinones was on top of her. Quinones touched S.D.'s outer vaginal area and told her that he was showing her what boys would do to her when she got older.

S.D. described several other incidents. She could not recall the exact dates the incidents occurred, and she could not remember if they took place before or after her brother N. was born. In one incident, Quinones went into her room at night and placed his hands on her outer vaginal area. In another incident, S.D. was with Quinones in the master bedroom, and he pressed something hard against her buttocks.

S.D. estimated that Quinones touched her inappropriately approximately 10 times over the years. Quinones would always take off her pants, but he would never touch the inside of her vagina. S.D. could not remember any incidents after N. was born because her memory after that became "fuzzy." S.D. did not tell anyone about what happened because she did not think anyone would believe her.

When she was between 12 and 14 years old, S.D. spoke to a therapist about Quinones's molestation. When she was 18 years old, S.D. told her mother about what had happened between her and Quinones. S.D. also told her brother S., and she confronted Quinones. At some point, S.D. spoke with her sister J.D. about what had happened to her. S.D. also knew that her sister P.D. became aware of S.D.'s accusations against Quinones. Later, J.D. told S.D. that something had also happened to her. P.D. never spoke to S.D. about her experiences with Quinones, but J.D. commented to S.D. that something similar had happened to P.D.

S.D. was taken to a shelter when she was a child after M. made her allegations against Quinones. S.D. spoke to law enforcement officers around that time, but she told them that no one had touched her inappropriately. Two years before Quinones's trial, S.D. reported Quinones's molestation to a law enforcement officer.

### 5. *G.D.* (*Counts 34-35*)

G.D. was born in 2003. When she was around three or four years old, she lived at a house in San Jose with her mother, her mother's boyfriend, and her siblings. Quinones also lived in the house. He was G.D.'s mother's boyfriend's friend.

On her fifth birthday, G.D.'s mother and boyfriend held a party for G.D. and invited family and friends. Quinones also attended the party. At some point during the party, G.D. went inside her house to look for her mother. G.D. went into her brothers' room, and Quinones walked into the room after her and closed the door behind him. Quinones put her on the bottom bunk of her brother's bed. She felt Quinones touch her right inner leg and then felt a lot of pain. Quinones move his hand up toward G.D.'s vagina, and she felt his finger inside of her. Quinones then picked G.D. up and placed her on the floor. G.D. remembered that she curled up into a ball with her knees in front of her chest. She heard the sound of a zipper, and she saw Quinones's penis. G.D. could not remember what happened next. She remembered that she saw Quinones leave the room. She also saw her brother walking toward her. G.D. saw blood on her leg, and her

9

brother wiped her leg down with a towel.  G.D.'s brother did not say anything to her, but he walked her outside to the party and stayed with her.

A year before Quinones's trial, G.D. spoke to her brother about what had happened with Quinones.  Later, G.D.'s brother told G.D.'s mother about what G.D. had told him.  G.D.'s mother took her to the police.

G.D. knew M.D.'s great-aunt as a family friend.  G.D. had lunch with M.D.'s great-aunt about six months before Quinones's trial, which was before G.D. reported Quinones's actions to the police.  At the time, M.D.'s great-aunt asked G.D. if anything inappropriate had happened between her and Quinones.  G.D. did not want to discuss the topic over lunch, so she responded that nothing had ever happened with Quinones.

### 6. *M.D.'s Great-aunt's Family*

M.D.'s great-aunt's daughter (daughter) was close with M.D.'s great-aunt and with M.D., and she visited M.D.'s great-aunt frequently when M.D. lived with her.  M.D. never told her daughter that anything inappropriate was happening with Quinones.  Daughter also never observed any inappropriate behavior between Quinones and M.D.  Daughter knew that Quinones had a prior conviction for a sexual offense, and she observed Quinones's behavior with that information in mind.

M.D.'s great-aunt's son (son) lived with Quinones, M.D.'s great-aunt, and M.D. when M.D.'s great-aunt had custody of M.D.  He was close with M.D. and treated her like a sister when they lived together.  At the time of Quinones's trial, son was no longer in touch with M.D.  Son said that M.D. had "abandoned [their] family and didn't really keep in touch with [them]" after she moved out.  Early on during his mother's relationship with Quinones, son became aware that Quinones had a prior conviction for a sexual offense.  However, he never saw Quinones behave inappropriately toward M.D.

M.D.'s great-aunt was still in a relationship with Quinones at the time of his trial.  M.D.'s great-aunt was concerned when she first learned that Quinones had a prior conviction for a sexual offense.  However, she spoke with her children, researched

Quinones on the Internet, and discussed the issue with Quinones. After doing all of these things, she no longer felt concerned about Quinones's past. She never discussed Quinones's prior conviction with M.D. She also never saw Quinones act inappropriately toward M.D.

### 7. *Quinones's Sister*

Quinones's sister visited Quinones at his house around the time that N. was born. Quinones's sister stayed overnight with Quinones and his family. During her visit, she never saw Quinones touch S.D. inappropriately.

### 8. *Stipulations and Quinones's Prior Convictions*

The trial court determined that all the charged conduct was cross-admissible and constituted evidence under Evidence Code sections 1101, subdivision (b) and 1108. The trial court also determined that it would consider the fact that Quinones was convicted in 1993 of two counts of rape (§ 261, subd. (a)(2)) against M. as evidence under Evidence Code section 1108.

The parties also made the following stipulations: In August 1991, M. reported to the police that she disclosed Quinones's abuse to her family. On November 21, 2014, a detective with the San Jose Police Department interviewed M.D., and she told the detective that the incidents with Quinones were occurring three times a week. P.D. spoke with an investigator on December 11, 2015, and met with the investigator on December 16, 2015. P.D. made her disclosures to the investigator during those conversations and said that she was probably 14 or 15 years old the last time that Quinones did something inappropriate to her. S.D. disclosed her allegations to the investigator in March 2016, and she said that at least one touching happened after her brother N. was born, and another touching incident took place sometime within a day or two of when N. was born. J.D. disclosed her allegations to an investigator in January 2016. Finally, the parties stipulated that the amended complaint and information that included P.D., S.D., and J.D. as victims were filed within one year of their police reports.

11

## C. *Verdict and Sentencing*

On June 25, 2018, the trial court found Quinones guilty of all charged counts except for two counts of continuous sexual abuse (§ 288.5, subd. (a); counts 28 (P.D.) & 30 (J.D.)) and one count of lewd conduct (§ 288, subd. (a); count 32 (S.D.)).[2]  As to count 35, the trial court also found the allegation that Quinones had substantial sexual conduct with G.D. within the meaning of section 1203.066, subdivision (a)(8) not to be true.

On January 7, 2019, the trial court sentenced Quinones to a total term in prison of 1,320 years to life consecutive to 36 years.  The sentence was imposed as follows:  six years for count 27; six years concurrent for count 29; 12 years for count 33; six years for count 25; six years for count 26; six years for count 31; 12 terms of 25 years-to-life for counts 13 through 24; 13 terms of 75 years-to-life for counts 1 through 12 and 35; and 45 years to life for count 34.  The trial court also imposed various fines and fees, including a $300 restitution fine, a $1,140 court security fee, and a $900 criminal conviction assessment.

## II. DISCUSSION

On appeal, Quinones argues that his trial counsel rendered ineffective assistance by failing to argue that otherwise time-barred claims were not sufficiently corroborated with independent evidence as required by section 803, subdivision (f), the sentence imposed constituted cruel and unusual punishment under the federal Constitution, the trial court erred by imposing certain fines and fees without first determining his ability to pay, and the abstract of judgment should be corrected to indicate that the court imposed a sentence of 45 years to life for count 34.

---

[2] Count 28 was charged in the alternative to counts 25, 26, and 27.  Count 30 was charged in the alternative to count 29.  Count 32 was charged in the alternative to count 33.

## A. Ineffective Assistance of Counsel

### 1. General Principles and Standard of Review

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish that counsel's performance was deficient and that there was prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) The deficient performance component of an ineffective assistance of counsel claim requires a showing that counsel's representation was objectively unreasonable "under prevailing professional norms." (*Id.* at p. 688.) With respect to prejudice, a defendant must show "there is a reasonable probability"—meaning "a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.)

### 2. Failure to Raise a Statute of Limitations Defense

Six of Quinones's convictions (counts 25-27 (P.D.), 29-31 (J.D.), 33 (S.D.)) arose from sexual offenses that he committed against P.D., J.D., and S.D. between January 1, 1988 and August 12, 1991. The prosecution alleged in the information that the statute of limitations for these counts were tolled under section 803, subdivision (f). Quinones argues that his trial counsel rendered ineffective assistance by failing to challenge the time-barred claims and pursue a statute of limitations defense. We reject Quinones's claim.

If a pleading is barred by the statute of limitations, the prosecution must allege facts that will bring the action back within the applicable limitations period. (*People v. Crosby* (1962) 58 Cal.2d 713, 724.) Section 803, subdivision (f) tolls the statute of limitations and permits the filing of a criminal complaint against a defendant within one year of a police report for certain sexual offenses committed against victims when they

13

were less than 18 years old, including violations of sections 288, 288.5, former section 288a, and section 289, if the following criteria are met: (1) the limitations period specified in sections 800, 801, or 801.1, whichever is later, has expired, (2) the crime involved substantial sexual conduct as described in section 1203.66, subdivision (b), excluding masturbation that is not mutual, and (3) there is independent evidence that corroborates the victim's allegations. If the victim is 21 years of age or older at the time of the report, section 803, subdivision (f)(2)(C) states that "the independent evidence shall clearly and convincingly corroborate the victim's allegation." Under section 803, subdivision (f)(3), "[e]vidence may not be used to corroborate the victim's allegation if that evidence would otherwise be inadmissible during trial." Moreover, "[i]ndependent evidence does not include the opinions of mental health professionals." (*Ibid.*)

In Quinones's case, the prosecutor alleged the independent evidence that corroborated counts 25 through 27, 29 through 31, and 33 included the following: M.'s preliminary hearing testimony in Quinones's prior criminal case and the preliminary hearing and the anticipated testimonies of M.D., P.D., J.D., S.D., and G.D. in the current case. As we previously noted, the trial court determined that all of the charged conduct was cross-admissible and constituted evidence under Evidence Code sections 1101, subdivision (b) and 1108. The trial court also determined that it would consider the fact that Quinones was previously convicted in 1993 of two counts of rape (§ 261, subd. (a)(2)) that were committed against M. as evidence under Evidence Code section 1108.

Evidence Code section 1101, subdivision (a) generally prohibits the admission of character evidence. This general prohibition against character evidence does not, however, prohibit admission of specific acts of misconduct to establish a material fact like intent, common design or plan, or identity as described in Evidence Code section 1101, subdivision (b). Evidence Code section 1108 provides that in a criminal case involving sexual offenses, "evidence of the defendant's commission of another

14

sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to section 352." (*Id*., subd. (a).) Under Evidence Code section 352, the trial court has the discretion to exclude evidence if its probative value is substantially outweighed by the probability that it will consume an undue amount of time or create a substantial danger of undue prejudice.

Other uncharged and charged acts of sexual misconduct admitted under Evidence Code section 1108 can constitute independent evidence that clearly and convincingly corroborates a victim's allegations under section 803, subdivision (f). (See *People v. Yovanov* (1999) 69 Cal.App.4th 392, 404 [uncharged sex acts that were similar to charged acts of molestation can be used to corroborate a victim's allegation of sexual abuse]; *People v. Mabini* (2001) 92 Cal.App.4th 654, 659 [uncharged acts of sexual misconduct, standing alone, constituted sufficient corroboration under former § 803, subd. (g)].)[3] The probative value of the other uncharged and charged acts is dependent on considerations such as the acts' frequency, similarity, and temporal proximity to the allegations of the victim that require corroboration. (*Yovanov*, *supra*, at p. 404.)

Here, the other uncharged and charged acts were of significant probative value. The testimonies of M.D., P.D., J.D., S.D. were strikingly similar. Each of the victims described a pattern of sexual activity that occurred when she lived with Quinones and that commenced when the victim was prepubescent and extended into her teens. Each of the victims described incidents of molestation or sexual assault that occurred on Quinones's demand. The assaults occurred within the child's family home: Quinones would take the minor female into a room alone or apprehend the child while sleeping or otherwise vulnerable. While the sex acts described by the victims ranged from inappropriate touching to oral sex and intercourse, each type of act was perpetrated on at least two of

---

[3] The provisions in section 803, subdivision (f) were first codified in section 803, subdivision (g). (Stats. 1993, ch. 390, § 1, p. 2226.)

15

the girls. Quinones was convicted of raping M. in 1993. P.D. testified that Quinones raped her around the same time period. P.D., J.D., and S.D. all testified about incidents that occurred during the time period M. was raped. M., P.D., J.D., and S.D. were siblings, and Quinones was S.D.'s father and the stepfather to M., P.D., and J.D. M.D. lived as a family member with her great-aunt and Quinones. G.D. described a sexual assault that occurred while Quinones lived in her home. Together, the witnesses provided clear and convincing evidence that corroborated the acts alleged in the counts that would otherwise have been subject to the statute of limitations.

Quinones asserts that trial counsel's failure to challenge the existence of clear and convincing evidence under section 803, subdivision (f) had no rational, tactical purpose. He argues that his trial counsel already made the generic assertion that corroboration was missing for the claims. During closing argument, Quinones's trial counsel stated that "[his] entire argument about the case [was] that there is no physical evidence to corroborate the allegations . . . ." Furthermore, none of the victims knew that Quinones was molesting anyone else. Additionally, P.D., J.D., and S.D. all testified that they told law enforcement officers that they were not molested when they were questioned after M. made her allegations in 1991.

We are not persuaded. Given the strength of the evidence, Quinones's trial counsel could have reasonably concluded that it would have been fruitless to make an argument that counts 25 through 27, 29 through 31, and 33 lacked clear and convincing corroborating evidence within the meaning of section 803, subdivision (f). Trial counsel does not render ineffective assistance by failing to make a meritless argument. Nor was it irrational for trial counsel to determine that Quinones could have success in challenging the testimony of individual victims as insufficient under the higher standard of proof beyond a reasonable doubt required to prove guilt, but he would fail at a challenge to the counts as time-barred given the lower standard of proof applicable under section 803, subdivision (f).

16

We also reject Quinones's attempts to analogize his trial counsel's failure to pursue a statute of limitations defense to the situation contemplated by the United States Supreme Court in *McCoy v. Louisiana* (2018) __ U.S. __ [138 S.Ct. 1500] [2018 U.S. Lexis 2802] (*McCoy*).  In *McCoy*, defendant's trial counsel, over defendant's objection, conceded that defendant killed three victims.  (*Id*. at p. __ [138 S.Ct. at p. 1506].)  Defendant's trial counsel did so because he believed that an admission of guilt would assist defendant in avoiding a death sentence at the penalty phase.  (*Id*. at p. __ [138 S.Ct. at p. 1506].)  The Supreme Court concluded that the concession violated the defendant's Sixth Amendment right to assistance of counsel.  (*Id*. at pp. __ [138 S.Ct. at pp. 1508-1509].)

Quinones argues that his trial counsel's decision not to pursue a statute of limitations defense was tantamount to an implied concession that there *was* clear and convincing evidence to support the otherwise time-barred counts.  Quinones thus insists that his trial counsel's actions were similar to the actions taken by the trial counsel in *McCoy*.  The Supreme Court in *McCoy*, however, reiterated that "[t]rial management is the lawyer's province:  Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.' " (*McCoy*, *supra*, at p. __ [138 S.Ct. at p. 1508].)  In contrast, fundamental decisions are reserved for the client—"whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." (*Id*. at p. __ [138 S.Ct. at p. 1508].)  Pursuing a statute of limitations defense is not a fundamental decision that is reserved solely for the defendant, and a tactical decision not to pursue such a defense did not prevent Quinones from making a "fundamental choice[] about his own defense." (*Id*. at p. __ [138 S.Ct. at p. 1511].)  Quinones's trial counsel did not, like the trial attorney in *McCoy*, overrule Quinones's autonomy and concede his guilt by foregoing such a defense but in fact argued that Quinones was not guilty of the charges beyond a reasonable doubt.

17

Quinones also cannot demonstrate that he was prejudiced by his trial counsel's omissions. The evidence offered to prove clear and convincing corroboration of the victims' allegations in the counts subject to the statute of limitations consisted of proof of the charged offenses, as well as Quinones's prior convictions for raping M. These were also admitted under Evidence Code sections 1101 and 1108 to prove Quinones's guilt. The trial court found Quinones guilty of the charges that fell outside the statute of limitations and thus concluded that the testimonies of the victims provided proof beyond a reasonable doubt that Quinones had engaged in the acts the victims described. Quinones's prior convictions also constituted proof beyond a reasonable doubt that he had raped M. As a result, it is not reasonably probable that the trial court would have reached the conclusion that this evidence was insufficient to provide corroboration under the lower clear-and-convincing standard of proof applicable in a statute of limitations challenge.

As Quinones fails to demonstrate both that his trial counsel's actions fell below an objective standard of reasonableness and that he was prejudiced by his counsel's actions, his claim of ineffective assistance of counsel must be rejected.

## B. *Eighth Amendment*

Quinones argues that his sentence (1,320 years to life consecutive to 36 years) violates the Eighth Amendment's prohibition against cruel and unusual punishment because it is disproportionate to his non-homicide offenses, serves no legitimate penological purpose, and undercuts the legitimacy of the criminal justice system due to its absurdity. "A punishment violates the Eighth Amendment if it involves the 'unnecessary and wanton infliction of pain' or if it is 'grossly out of proportion to the

severity of the crime.' " (*People v. Retanan* (2007) 154 Cal.App.4th 1219, 1230 (*Retanan*).)[4]

Generally, a failure to object in the trial court that a punishment is cruel and unusual forfeits the claim on appeal. (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1237; *People v. Kelley* (1997) 52 Cal.App.4th 568, 583.) Quinones did not object to his sentence below. However, he argues that his claims are not forfeited because they present pure questions of law because "[h]is contention is simply that a sentence of more than 1,300 years for non-homicide offenses is per se violative of the Eighth Amendment." Quinones, however, mischaracterizes his own appellate arguments. In addition to his argument that his 1,320-year sentence is per se violative of the Eighth Amendment, he *also* argues that the sentence is grossly disproportionate to the severity of his crimes. An analysis of the proportionality of his sentence to his criminal convictions is necessarily fact-based. Accordingly, his contentions about the proportionality of his sentence have been forfeited due to his failure to raise them below.

Assuming that Quinones did not forfeit his claim that a sentence that is 1,320 years is per se violative of the Eighth Amendment, we nonetheless reject it on the merits. Quinones argues that a sentence that he cannot conceivably complete violates the Eighth Amendment. He relies on Justice Mosk's concurring opinion in *People v. Deloza* (1998) 18 Cal.4th 585. In *Deloza*, Justice Mosk wrote, "A sentence of 111 years in prison is impossible for a human being to serve, and therefore violates . . . the cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution . . . ." (*Id.* at pp. 600-601 (conc. opn. of Mosk, J.).) Justice Mosk's concurrence, however, is not

_____

[4] "California affords greater protection to criminal defendants by prohibiting cruel 'or' unusual punishment," unlike the federal Constitution, which prohibits cruel *and* unusual punishment. (*People v. Haller* (2009) 174 Cal.App.4th 1080, 1092.) Quinones, however, does not argue that his sentence is unconstitutional under the California constitution. He argues only that his sentence is cruel and unusual under the Eighth Amendment of the federal Constitution.

binding precedent. " '[N]o opinion has value as a precedent on points as to which there is no agreement of a majority of the court.' " (*People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383 (*Byrd*).)

As Quinones was 63 years of age when convicted, the sentence imposed amounted to life in prison. Quinones has not cited to any cases that have held that a sentence that is longer than the human lifespan is per se violative of the Eighth Amendment. On the contrary, courts have consistently held that lengthy prison sentences that exceed the human lifespan are constitutional as an expression of society's condemnation of the crimes of which the defendant is convicted. (*Byrd*, *supra*, 89 Cal.App.4th 1373 [sentence of 115 years plus 444 years to life was constitutional]; *Retanan*, *supra*, 154 Cal.App.4th 1219 [sentence of 135 years to life was constitutional].) We have been provided with no legal justification to depart from this precedent here and conclude the length of Quinones's sentence does not violate the federal Constitution's prohibition against cruel and unusual punishment.

### C. Fines and Fees

At the sentencing hearing, the trial court imposed a $300 restitution fine under section 1202.4, subdivision (b), a court operations assessment of $1,140 under section 1465.8, and a criminal conviction assessment of $900 under Government Code section 70373.[5] Quinones did not object to the fines and fees at the sentencing hearing.

_____

[5] Quinones argues in his opening brief that the trial court imposed a $1,141 fine under section 1465.8. Quinones derives this figure from the reporter's transcript, which appears to have a clerical error. During the sentencing hearing, the trial court asked the probation officer if the "minimum [for the fine imposed under section 1465.8] is $1,141," and the probation officer answered "[y]es." The trial court's statement reflects its intent to impose the amount recommended in the probation report. The probation report, however, recommends a minimum fine of $1,140, not $1,141. Furthermore, the abstract of judgment reflects that the trial court imposed a $1,140 fine under Penal Code section 1465.8. "[T]he older rule is to give preference to the reporter's transcript where there is a conflict, [but] the modern rule is that if the clerk's and reporter's transcripts cannot be
(continued)

On appeal, he argues that the trial court erroneously imposed these fines and fees without first determining his ability to pay in violation of due process under *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1168 (*Dueñas*). Appellate courts have reached conflicting conclusions on whether *Dueñas* was correctly decided, and the issue is presently pending before the California Supreme Court. (See, e.g., *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)

Assuming without deciding that *Dueñas* was correctly decided, we find that any error for failure to conduct an ability to pay hearing was harmless because the record demonstrates that defendant could not have established a meritorious inability to pay argument against the imposition of the fines and fees, which total $2,340. (See, e.g., *People v. Jones* (2019) 36 Cal.App.5th 1028, 1035.) Quinones's *Romero*[6] motion stated that he had "worked throughout his life," he identified himself as a " 'jack of all trades,' " and he had experience working in electronics and as a graphic designer. The probation report also stated that he had held side jobs as a plumber and was employed for four years as a caregiver for the elderly until his arrest in this current case. This record supports the inference that Quinones maintained employment throughout most of his adult life (which, as Quinones is now 63 years old, spans four decades), has the ability to work, and thus an ability to pay the fines and fees.

Quinones was sentenced to a term in prison that will exceed his lifespan. Every able-bodied prisoner is required by statute to perform labor. (§ 2700.) In general, wages in prison range from $12 to $56 per month (Cal. Code Regs., tit. 15, § 3041.2, subd. (a)(1)). We acknowledge that at the time of sentencing, Quinones was already

---

reconciled, the part of the record that will prevail is the one that should be given greater credence in the circumstances of the case." (*People v. Pirali* (2013) 217 Cal.App.4th 1341, 1346.) Under the circumstances, we believe the reference to the $1,141 fine in the reporter's transcript is the result of a transcription error.

[6] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

63 years old, and his advanced age might limit the number of years he is physically able to work. However, there is nothing in the record that indicates that Quinones would be unable to work for at least some period of time while incarcerated. Courts have generally accepted that a defendant's ability to pay fines and fees includes the prospect of earning prison wages and monetary gifts from family and friends. (*People v. Jones*, *supra*, 36 Cal.App.5th at p. 1035 [ability to pay includes prison wages]; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1077 [ability to pay includes potential to earn prison wages and monetary gifts from family and friends]; *People v. Santos* (2019) 38 Cal.App.5th 923, 934 [a defendant's present ability to pay includes prison wages].)

Perhaps of more significance, the "devastating consequences" of a failure to pay the fines and fees cited by the *Dueñas* court, such as damage to credit, restrictions in employment, or the risk of incarceration from probation violations, are not applicable to Quinones. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1168.) He cannot be further incarcerated as a result of any failure to pay the fines and fees. For these reasons, we conclude that remand for an ability-to-pay hearing is not required here.

### D. *Abstract of Judgment*

During the sentencing hearing, the trial court imposed a term of 45 years to life for count 34. The abstract of judgment, however, incorrectly states a sentence of 75 years to life for count 34. Quinones argues that the abstract of judgment should be corrected to reflect a sentence of 45 years to life, and we agree. "In a criminal case, it is the oral pronouncement of sentence that constitutes the judgment." (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1324.) In general, if the "abstract of judgment is different from the oral pronouncement of judgment, the oral pronouncement controls." (*People v. Mullins* (2018) 19 Cal.App.5th 594, 612.) Thus, we order the abstract of judgment modified to reflect a sentence of 45 years to life for count 34.

22

## III. DISPOSITION

The trial court is directed to amend the abstract of judgment to reflect a sentence of 45 years to life for count 34 and to send a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

_____

Greenwood, P.J.

WE CONCUR:

_____

Elia, J.

_____

Grover, J.

People v. Quinones
No. H046717